Good morning, and may it please the Court. My name is Gabriel Hawkins. I represent Relator in this appeal, and Relator asks that this Court vacate the District Court's entry of summary judgment because Fluor had a contractual obligation to employ only licensed electricians in furtherance of journeyman electrical work under Task Order 5, and Fluor not only failed to impose its contractually chosen means of satisfying this basic safety obligation, but did not impose any of the contract's listed means of qualifying electricians under the contract. Mr. Hawkins, what is your best evidence that OCN helpers were performing journeyman work without being properly supervised, and where in the record will we find that evidence? Mr. Hawkins There are affidavits from various individuals who witnessed this work. There is really the email that gave rise to this whole dispute, so to speak, Your Honor. In that email, Relator notifies Fluor and the government that he's at Base NKC, and this whole entire base doesn't have a single licensed journeyman on base. It has a single journeyman who does not possess a license, and by definition, if the whole base does not have a single licensed journeyman, it's necessarily the case that unlicensed journeymen. You know, speaking of those emails, in one of them, the plaintiff asserts that he was told he would be fixing flash reports. What are flash reports? And what's the significance of that part of the email? My understanding is flash reports is when electricity is arcing, so to speak, and you can see the arc from the electricity, and that requires the electrician to properly bound and ground the incident causing the report. The significance of that is that's clearly electrical work as defined by Section 2.3 of the Governing Trade Certification and Validation Program. Does that answer your question, Your Honor? Thank you. In addition to the two items of evidence that I just mentioned, Your Honor, I would also point out to the evidence of Fluor supervisors destroying work orders performed by OCN electricians. Before you go into that, did the contract require licenses? Not directly, but indirectly. The contract required Fluor to opt between one or more of four options, license being one of the options. The other three options were certification, a degree, or verifiable minimal experience. Fluor admits that it opted for this licensure requirement and at no point even alleges that it fulfilled any of the other listed obligations in the contract. But where's the evidence that the helpers who performed the work were not qualified to do the type of work? Qualified, as defined by the contract, Your Honor, is one of the four listed means. Fluor opted for a licensure requirement, and Fluor admits candidly in its brief that none of the OCNs possess this licensure requirement. I think that's a misreading of the contract. It permits the company to elect various means of ensuring that their employees are qualified. It's entirely permissive. There's no lock-in of a particular method under either the base contract itself or this qualifications plan, or not certification, but the quality assurance plan, for lack of a better term. It's got some acronym. I think it's a trade certification and validation plan, Your Honor. Right, right. And while I would agree with the court that Fluor was not required to specifically impose the license requirement, it could have opted for any of the four. I don't think there's any dispute, or at least not to my understanding. The point is it doesn't require a global selection. It just leaves it entirely permissive to the contractor as to how to qualify its people. It requires a selection of one of the four, or maybe even one of the four. Correct. You can use any of the four at any of the locations. It doesn't require an exclusive selection. You seem to be arguing that once a selection is made, it's exclusive and there can be no variation from that, and that's just not what the contract says. My contention, Your Honor, is that Fluor made the exclusive selection to impose that. But there's no exclusive language in either the contract itself or the plan. Okay. Stated differently, Your Honor, Fluor opted as its exclusive means of satisfying the contractual requirement to impose a licensure requirement. So you think there was a breach of contract here? Yes, there was, Your Honor. There was a breach of contract? Yes, by employing unlicensed electricians and by employing electricians who didn't satisfy any of the four listed means. But the contract does not require licenses. I mean, that's sort of a circular argument that I'm making. I don't believe so, Your Honor. I believe the contract requires one of the four listed means. Fluor elected license as that listed means and didn't impose any, there's no evidence or even an allegation that it imposed any of the other three listed means. If this were a case where Fluor opted for the licensure requirement and it turns out that they were using degrees or some other variance, we wouldn't be here right now. I would agree that that would not, it certainly wouldn't be a material breach of the contract. But when Fluor opted for the license election and then didn't impose any of the other, that was necessarily dispensing altogether with the baseline requirement to qualify electricians. And I think it goes even further than that, Your Honor, because once Fluor, by its admission, imposed this licensure requirement, it made all non-licensed electricians helpers. Helpers, by definition, are not permitted to perform journeyman electrical work, that is, electrical work without supervision. So even if the court concludes, okay, a license, it could impose other means of qualifying electricians, even if the court concludes that it did, which there's no evidence that it did, Fluor would still be in breach of the contract because once it designated all non-licensed individuals as helpers, by definition, those individuals were not permitted to perform journeyman electrical work. Now, of course, Mr. Eulig never read the government contract, did he? That's correct, Your Honor. And normally I would say that would be perhaps even fatal to at least the opening salvo of a False Claims Act allegation. However, I would point out, I'd point the court to Fluor's answer in paragraph 3.11 of the court, of Fluor's answer, when it admits that it informed Eulig that Fluor's licensure requirement arose under Task Order 5 of the governing contract. So Relator was specifically informed by Fluor of this licensure requirement, and his next step, he didn't go off and file a suit, he didn't go off and retain an attorney. His next step was to approach his supervisor and say, this isn't right. Fluor is breaching this obligation, and Fluor's supervisor indicated that it agreed with Relator, but it was out of his hands. So did he send the emails to his supervisor, the government client, and a whistleblower website all at the same time? There were two sets of emails. The first email was not sent to the whistleblower website. The first email was sent just to the government and to his supervisors. The second email, he cc'd, I believe, an attorney and the whistleblower website, which is referred to as Ms. Sparky, Your Honor. Again, in addition to the fact that Fluor doesn't even allege that it imposed any of the qualification requirements listed under its trade certification and validation program, other than a licensure requirement, what's crucially important is the contract's indication that journeymen are without supervision, whereas helpers are individuals who may work with, who require supervision before doing that work. Your only theory of breach in the district court, as I understand it, was this interpretation of the contract that requires licensure. This argument that you're making now, the sort of even-if argument, is new on appeal, as far as I can tell. No, I believe I indicated, and sorry, I don't have the page site, but I think in the briefs below, I'm sorry, in the lower court, it specifically pointed to the helpers and that Fluor, by definition, the contract would not permit helpers to do this work in an unsupervised means. And that's where I believe I preserved this argument that I'm raising now and that I raised in the briefing before this court. Well, the district court apparently didn't consider it preserved because there isn't any discussion of it. The district judge read your argument as exclusively resting on this idea that once the company decided to impose a licensure requirement, any other means of qualifying its personnel were foreclosed, that there was some sort of exclusivity requirement, and that's just not in the contract language, and so the court said there was no breach. I would certainly agree that the district court did not even discuss the import of helpers. Obviously, it's either in my brief or it's not, and the court will make that decision. Well, the question is whether it was adequately developed as an alternative theory of brief so that we can reach it independently, even though the district court did not, and I don't see it as adequately developed. You've done a more robust job on appeal than in the district court, but I'm not sure that's enough. I must tell you that I'm right there with my sister. You know, sort of a collection of sentences that hinted a theory, but I don't see it spelled out. We're talking about the alternative contract. Yes, I certainly – Well, you never called it by that name. You never present – I mean, where's the cohesive argument? If you could help us with that. Sure. But there are no cases that were cited in support of it, as I – That's correct, Your Honor. In terms of labeling it an alternative contract and the cited cases, that was not included below. However, the argument is exactly the same. In fact, I even quote it in my brief. The argument is that Floor opted for the licensure requirement, did not impose any of the other listed means of fulfilling that requirement. That was the specific argument raised below. The only difference in my appeal, the appellate brief, is that I managed to find cases to stand for that proposition. My understanding of the waiver rule employed by this circuit is that citing authority for the first time does not amount to waiver. Calling it an alternative contract for the first time does not amount to waiver. Well, Mr. Gabriel, you're – excuse me, Mr. Hawkins. Sure. Mr. Hawkins, the cases you cite, though, deal with mutually exclusive choices under a contract. I find it difficult to find that that's what we have here. In fact, I think that's absolutely right, Your Honor. The cases do deal with mutually exclusive choices. But I think the principle is the same. And that principle is the contracts can afford a contractor discretion in deciding how they implement a contract. But once the contract opts for that discretion, they have to perform thereby. Otherwise, it would be illusory. Once a contractor chooses a means of implementing that is available under the contract, they're bound thereby. And furthermore, Your Honor, what I think is equally important, again, we're not talking about a situation where FLOR even alleges that it's imposing any of the other. That would be a much harder case. That would be – it probably wouldn't be here right now. But the fact of the matter is FLOR doesn't even make the allegation that it's imposed – that it imposed multiple means or that it did anything other than a licensure requirement. By way of a related contention, FLOR makes much to do of relators' use of the term electrical work. I would like to point out that that's not relator's term. It's FLOR's term. It's defined specifically under Section 2.3 of the contract. And that is the use that relator is referring to when it refers to as electrical work. There are specific tasks that are spelled out under the contract that says this is what electrical work is and that is what it consists of. And on a final point, FLOR says this is my interpretation of the contract. This is something new. This is something that's not been raised before. I would respectfully contend that it's not relator's interpretation of the contract, Your Honor.  As stated in the briefs, there are multiple emails that explicitly state that these OCN electricians are not, quote-unquote, are not qualified to be performing this work under the contract. There's deposition testimony where a manager by the name of Reynos admits that from the beginning of the contract, it was his understanding that FLOR had this licensure requirement. With that, I see the... Just one thing. Do either of the emails suggest that the contract with the government required all electrical work to be formed by licensed journeymen, or that there was no role for a licensed, unlicensed helper? I think there's two questions there, and I'd like to answer them both. What both emails suggest is the electricians wouldn't be, quote-unquote, qualified without this licensure requirement, and that they needed this licensure requirement to be qualified. And that's the crucial term under the contract. Your second question is, is there any role for these non-licensed attorneys? And the answer is, absolutely. And that role is specifically spelled out by the contract. They're helpers. They work under the supervision of journeymen electricians or foremans, not without it. Thank you, Your Honors. Thank you, Mr. Hawkins. Mr. Tomaszewski. Good morning, Your Honors. May it please the Court. First, I'd like to correct something I believe that Mr. Hawkins said. Flash reports have nothing to do with arcing or flashing. Flash reports are simply priority repairs that need to be made. And, by the way, although Mr. Hawkins said in his email that he was told he would be fixing flash reports, he admitted at his deposition that he doesn't recall whether he was, in fact, assigned to do that. So whether, in fact, he fixed any flash reports, there's no evidence to support that at a time when he had been demoted to a helper. I'd like to start you out, if I might, because the Supreme Court's ruling in Universal Health Services came out after you filed your response brief, and I imagine you would want to respond to the plaintiff's argument. I do, Your Honor. And although I believe that the dispositive issue in this case is whether there was a breach of contract, and as the district court held, there was no breach of contract here. And without a breach of contract, there could be no misrepresentation of compliance with the contract. But, assuming for the sake of argument that there was a breach of contract that could give rise to a misrepresentation, the court's fundamental holding in Universal Health was that it's up to the plaintiff, the relator in this case, to show materiality, to show that the FCA liability can attach, as the court said, if the contractor knows the contractual requirement is material to the government's decision to pay. And the court emphasized that the materiality requirement is both rigorous and demanding. The court, in fact, rejected the First Circuit's formulation, which was a much lower standard, that said misrepresentation was material if it merely gave the government the legal right not to pay. The court held that the plaintiff had the burden of coming forward with evidence that shows the government would not have paid the invoice if it knew all the facts. Eulig had that burden of proof on materiality, and he didn't carry it here. He came forward with no evidence that the government would not have paid Fluor's invoices if it knew some of Fluor's electrical workers were not licensed. And by the way, most of them were the journeymen. Eulig offered no testimony from any government witnesses about what the government regarded as material, and he provided no other evidence showing that the government had a policy of refusing to pay invoices in similar situations. On the other hand, the evidence showed that there was an utter lack of materiality on several grounds. The government didn't cease paying or dock Fluor's invoices after the army officers on the ground in Afghanistan had investigated Eulig's claim when Fluor asked him about it. And by the way, Fluor asking him about Eulig's claim is hardly the sort of behavior you would expect from someone who was committing fraud. The government didn't cease paying or dock Fluor's invoices after Eulig filed his lawsuit shortly after he was terminated. So this case is quite similar to United States ex-rel Marshall v. Woodward, in which this court held that misrepresentations were not material because the government kept ordering the helicopter parts after investigating the relator's claim that they were defective. Similarly, in United States ex-rel Thomas v. Black and Beach, the Tenth Circuit found a lack of materiality when the government kept paying invoices after learning that a defendant had fraudulently altered certain employee materials relating to their education. So as this court held in the Anacopolis case, speculation about what the government might have done if it knew must yield to actual evidence of what the government did, or in this case did not do, when it learned of the alleged falsehood. Is it your view that Eulig's reading of the Universal Health Services case would turn simple contract breaches into false claims virtually always? Well, that's certainly the danger here, and that's why in Universal Health, that's specifically why Justice Thomas emphasized the materiality aspect of it, to avoid simply saying that every breach of contract is material. You have to show some evidence that the government would have cared. Another reason why there's no evidence that the government would have cared here is the scale issue. This court said in the Absher case that it's important to know how many violations there were in the scale of things. Eulig has shown no specific number, how many times, let's assume for the sake of argument, that on some occasions a helper did do something without supervision that was a journeyman's obligation. If that happened once or twice or even a hundred times, out of the tens of thousands of times that electrical work was being done on this vast project in Afghanistan, I think the Absher court would say there's no showing the government would have regarded that as a material reason not to pay the invoices. Mistakes will happen, and mistakes do happen in a large, in a war zone, where you have a large spread out group of employees doing things. So that's another reason why there's no evidence of materiality here, and that's a protection against turning this into simply a breach of contract case. And finally, of course, the government didn't intervene in this case below, and has not even filed an amicus brief in this court. And in the Lucky case, this court expressly pointed to the evidence as evidence of non-materiality to the fact that the government had declined to prosecute the relator's claim on its own or to adopt the relator's position. The Universal Health Court also talked about scienter. Again, another issue, scienter doesn't factor into breach of contract cases, but it does factor into fraud cases. And as to scienter, Fleur had no reason to think that licensure was material to the government's decision to pay. Indeed, the contract itself, the base contract and then this plan that was filed about quality assurance and the context suggests that flexibility was primary. This is a multinational workforce, as I understand it, as you pointed out, in a war zone in Afghanistan, and the government requires the use of locals on this workforce as well. And so it seems to me that what was material was that there be flexibility on the part of the contractor to assure quality in any one of these variety of ways. That's exactly right, Your Honor. I couldn't agree more, and that's exactly what the situation was. And by the way, Mr. Hawkins emphasized several times that we haven't alleged that Fleur used any of the other methods of qualification for the unlicensed people. Well, it was not our obligation to allege that. It was his obligation to show that, and he didn't show that. What he showed was a few isolated instances where either Mr. Eulig or some friends of his reported that they thought they saw people doing work that they thought they shouldn't have been doing. Now, you did, I think, concede that he didn't have immediate access to the government contract, but did he have any access to the contract? No, Your Honor. It would not be the normal course of things for any employee to have access to the government contract, but while he didn't have access to the government contract, he also did not have a need to make his complaint right away if he thought there was a false claims act violation. He could have seen a lawyer. He could have had it evaluated. He could have done further investigation. As it stands, and this really relates to the retaliation claim more than anything else, he had no proper basis, no factual basis for alleging that there was a false claims act violation, and, in fact, he didn't allege there was a false claims act violation. There was another point that you have not had an opportunity to reply to, and that's in the reply brief at page 5. He contended that tasks that Floor admits were performed by helpers are listed in the TCVP as tasks that are supposed to be performed by electricians, so you might want to respond to that claim. Well, it's certainly possible that on occasion, as I said, in this situation, a helper performed a task that should have been either performed by a journeyman or, and this is another aspect that Mr. Hawkins completely ignores, what it says is that helpers can work under the supervision of a journeyman, and there's no allegation that any of this work was not done under the supervision of a journeyman who could come by and check the work or watch it while it was being done and give instruction. The whole point of the helpers, which is another name for apprentices in this situation, is to teach people how to do the work. So in that sense, the allegations, I think, that helpers were doing certain types of work doesn't really advance the ball because, number one, if it happened, there's no evidence that it happened on any material scale, and number two, there's no evidence that it wasn't supervised in some way. And there's no evidence that any, by the way, there's no evidence of any actual falsehood because all of these work orders that are the basis of the claim were truthful. They were signed, they described the work that was done, and they were signed by the people who actually performed the work. So there was no attempt other than some isolated instances, which Mr. Ulich has dug up, of people who claimed that on a few occasions some low-level supervisor told them to change work orders. There's no evidence that that was Fluor's policy. There's no evidence that anyone responsible for submitting Fluor's invoices even knew about that. Things do happen. That doesn't make it Fluor's policy. This case, on some level, really is about who can change a light bulb because below, Mr. Ulich submitted a bunch of work orders that he claimed were evidence of his fraud, and in the record from the district court at pages 1011 to 1012, there's one of the work orders that Mr. Ulich alleges is the basis for a breach of contract, and it's a work order in which the problem was burned-out light bulb, and it's a work order in which the fix was put in a new fluorescent tube. Mr. Ulich claims that because the person who did that didn't have a license, that violated the contract, and that makes no sense. You know, there's readily seen from the contract that each of these methods of qualification is and-or, but Mr. Ulich, before the district court, and really even in his opening statement here, conceded that if Fluor did not have a contractual obligation to employ licensed electricians, Ulich does not have a claim to begin with. That was a statement from his brief in the district court, and the district court correctly held that Ulich did not have a claim to begin with because Fluor did not have a contractual obligation to employ licensed electricians. That's not what the contract says. Now, there was evidence, as Mr. Hawkins points out, that some Fluor employees said something different about what they thought the contract meant, but, as this court well knows, the meaning of a contract is a matter of law to be determined by the contractual language, and it's not unusual in any organization in a long and complicated contract that people after the contract is executed will have opinions about what the contract means. That can't change what the contract means. The contract says what it says, and the fact that some employees who might have been ill-informed or who might have had their own opinions said something different, and, by the way, the testimony on that was rather inconclusive because people said one thing, people said another thing, and that's not unusual. If you're reading a contract, you'll form your own opinion. That doesn't change what the contract says, and Judge Mim was clear on that. I'd like for a moment to turn to the retaliation claim, which Mr. Hawkins didn't cover too much, but I think it's important because it's clear that Mr. Ulick sent these emails, and it's clear he was terminated shortly thereafter. But this court has made it clear that to establish a retaliation claim, an employee has to pass both an objective test and a subjective test, the objective test being whether a reasonable employee in the same position could have thought there was a False Claims Act violation, and the subjective test was whether the employee himself believed in good faith that there was a False Claims Act violation. District Court didn't reach the subjective test because it held that Ulick failed the objective test. At the time he was fired, he didn't know what the contract required, and if he had known, he and any reasonable employee would have seen that it doesn't require licensing. As this court said in Neill, which was overruled by the Supreme Court but on other grounds, the retaliation statute covers situations in which litigation could be filed legitimately that is consistent with Rule 11. Here Ulick had no objective basis for a claim that would have passed Rule 11 scrutiny. And finally... I guess what he thinks he had is that some of Fluor's employees thought that the contract required Fluor to ensure licensing. So I think he's then grafting on the thought that because others did, it would not be objectively unreasonable for him to have the very same belief, I think. Well, this court in Lange pointed out that what people around the office said is going on is not an objective basis without doing some investigation on your own. Number one. And number two, the evidence that he points to is really sort of inconclusive. He points to an email in which Fluor says, to better align our positions with contractual obligations, we're going to make these changes. It doesn't say we were out of compliance to begin with. It says to better align our practices with contractual obligations. And he points, as Mr. Hawkins said, to a statement made to him by Human Relations, a person after he first lodged his complaint. And his complaint was, and his complaint has specifically stated in his emails, was, hey, I don't have a license, but I'm being sent home, and these non-American citizens who are not U.S. taxpayers who don't have a license are being kept here. That doesn't identify any fraud. And when the person said to him, there's nothing I can do about it, which is what he says he was told, that's certainly not a concession that the contract requires licensing. It's simply a concession that Americans who didn't have licenses were too expensive to keep, and so unless he went and got a license, which he was free to do, by the way, to go home and get a license and come back. In other words, he would have had to go to a different state. Well, he would have had to go to some state because the state of Missouri does not offer licenses. And as a sidelight, it might seem, you know, we as licensed lawyers think that every profession has to be licensed, so it might seem that licensing is a natural for electricians, but it's clearly not. There are many jurisdictions that simply do not license electricians, and Missouri, where Ulig lived, is one of them. He didn't have a license. Now, nobody argues he wasn't qualified to be a journeyman electrician. He says so himself. He had experience. He had education. He was qualified under any standard of the contract, but he didn't have a license. And Illinois doesn't offer licensing to electricians either, by the way. There are jurisdictions within Illinois, for example, the city of Chicago, that offers licensing for electricians. But as a statewide matter, Illinois does not license electricians, and that's not unusual. So licensing of electricians so they can connect wires to power sources is apparently not something that is universally believed, unlike, say, the legal profession or unlike, say, a driver's license requires licensing. And clearly the government didn't think so either because it set out four things that could be done to qualify people. It said and, or in between each one of those, which is the classic way of saying it could be one, it could be any of them. It could be all of them. It could be some. And there's nothing in there, by the way, that says once a choice is made, it becomes irrevocable. And there simply was no contractual violation here. So we would respectfully submit that the district court's opinion should be affirmed. Thank you. Thank you, Mr. Tomaszewski. Mr. Hawkins. How much time? Three minutes? Thank you, Your Honor. What I'd like to start off with is it was just contended that Relator had no objective basis to believe that there was no contractual obligation. Floor admits in its answer that it informed him that it was a requirement of the contract for this journeyman licensure requirement. It's paragraph 3.11 of its answer. That in itself, I would submit to you, is an objective basis. Furthermore, with respect to the burden to show who does the other three obligations, it's Relator's position that Floor had agreed that it was going to satisfy this qualification requirement by a licensure requirement. Floor comes back saying they're qualified anyway. It doesn't say how they're qualified, notwithstanding its licensure requirement. It just says they're qualified. It doesn't say how they're qualified. It doesn't say what makes them qualified. It acknowledges that its only chosen method of fulfilling this quality requirement was its licensure requirement. With respect to another allegation, Floor contends that this was not a widespread practice. Floor doesn't acknowledge an email where the entire base does not have a single licensed electrician on it. Similarly, under a summary judgment standard, there are multiple affiants in here saying that they observed this practice not in an isolated manner, but on every base that they were stationed. And it occurred, quote, unquote, quite frequently. And I'd remind the Court of the contract itself, which indicates in its scope that employing qualified individuals at a journeyman level is its first priority. Something that is a contractor's first priority cannot be said to be an immaterial requirement. Your Honor pointed out that flexibility is part of the contract, and I would agree. The contract does provide Floor that flexibility. It could have said, you know what, what we're going to do is keep this open, and we're going to use all four methods. It didn't elect to do that, and not only did it not elect to do that, but when it failed to fulfill its licensure requirement, it didn't impose any of the other requirements. That's all I have, Your Honor. Thank you. Thank you, Shalkins. Thanks to all counsel. The case is taken under advisement.